1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BRIAN GOERTZ and BENSON MAXWELL, LLC,<br><br>                      Plaintiffs,<br><br>        v.<br><br>CITY OF KIRKLAND, WASHINGTON; ADAM WEINSTEIN, Planning and Building Director; and DAVID BARNES, Senior Planner,<br><br>                      Defendants. | CASE NO. 2:21-cv-00208-JHC<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |

## I.

### INTRODUCTION

This matter comes before the Court on Defendants' Motion for Summary Judgment.  Dkt. #21.  The Court has considered the materials filed in support of, and in opposition to, the motion, the applicable law, and the case file.  Being fully advised, the Court GRANTS the motion.

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 1

## II.

### BACKGROUND

Plaintiff Brian Goertz is the sole owner of Plaintiff Benson Maxwell, LLC.  Dkt. #26–4 at 1.  In October 2016, Plaintiffs bought a 1.52 acre property in Kirkland, Washington (the Property).  *Id;* Dkt. #22–3 at 77.  Defendant City of Kirkland (the City) has designated the northern part of the property—about half of the total acreage—as a wetland since as early as 1998.  Dkt. #26–4 at 2; Dkt. #22–3 at 211.  Washington law categorizes "wetlands" as "critical areas," and requires cities to adopt "development regulations" to protect them.  RCW 36.70A.030(6); RCW 36.70A.060(2).  Plaintiffs knew of the Property's wetland designation at the time of purchase in 2016.  Dkt. #26–4 at 2.

Defendant Wilson David Barnes is the Senior Planner for the City.  Dkt. #24 at ¶ 1.  Defendant Adam Weinstein is the Planning and Building Director for the City.  Dkt. #25 at ¶ 1.

In July 2017, the City, through Barnes, granted approval on a short plat[1] for Plaintiffs to develop nine single-family residences on the southern half of the Property.  Dkt. #22–3 at 77–122.  The approval included a condition that Plaintiffs grant the City a "Natural Greenbelt Easement," (also called a "Native Growth Protection Easement" (NGPE)) for the northern part of the Property containing wetland and wetland buffer area.  *Id.* at 78, 212.  The NGPE prohibits development or interference on the Property's wetland without written approval from the City, and it allows city employees to enter the Property to assess compliance with wetland preservation standards.  Dkt. #22–3 at 294–95.  The short plat also requires Plaintiffs to submit and abide by an extensive Wetland and Stream Buffer Mitigation Plan.[2]  *Id.* at 78, 81, 125–40.

---

[1] Plaintiffs adopted their short plat application—including wetland designations and development plans—from the prior owner of the Property.  Dkt. #22–3 at 211.

[2] The Wetland and Stream Buffer Mitigation Plan (Plan) is part of Plaintiffs' application for the short plat, but it is separate from the NGPE.  Dkt. #22–3 at 87–88.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Both Washington State and the City define "wetlands" as "areas that are inundated or saturated by surface water or ground water at a frequency and duration sufficient to support, and that under normal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions."  RCW 36.70A.030(31); Kirkland Zoning Code (KZC) 5.10.985. This definition excludes "those artificial wetlands intentionally created from nonwetland sites, including, but not limited to, irrigation and drainage ditches . . . or those wetlands created after July 1, 1990, that were unintentionally created as a result of the construction of a road, street, or highway."  *Id.*

In June 2018, Plaintiffs' attorney told the City that Plaintiffs had found an 18-inch culvert "releas[ing] a substantial quantity of water onto the [P]roperty," and "[a] ditch along the west side of Slater Avenue N.E." that drains onto the Property.  Dkt. #22–3 at 203.  Based on this discovery, Plaintiffs requested that the City allow them to investigate the hydrology of the wetland on the Property and revise the terms of the NGPE to allow for a "reopener"[3] in case anything found during the investigation "changes the regulatory impact" of the wetland.  *Id.* at 204.  The City granted the request, and both parties signed an Agreement[4] in July 2018 that revised the NGPE and gave Plaintiffs a year to investigate.  *Id.* at 211–15.

In July 2019, Plaintiffs requested that the City change the wetland designation on the northern half of the Property.  Dkt. #1–3.  Plaintiffs based the request on a report from Soundview Consultants, LLC, a wetlands delineation company hired to investigate the Property.

---

[3] A "reopener" would have allowed Plaintiffs to petition the City with new information about the wetland on the Property. Dkt. #22–3 at 206. The City would then determine whether the NGPE would need to be revised or terminated. *Id.*

[4] The City approved the short plat in July 2017, but Plaintiffs did not immediately record it with the county. Dkt. #22–3 at 211–213. The Agreement allowed the short plat to be recorded, including the NGPE, while giving the City leave to revise the NGPE in accordance with any new information about the wetland designation. *Id.*

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 3

1   *Id*; Dkt. #26–4 at ¶ 12.  The Soundview report concludes that the wetland on the northern part of

2   the property formed because of "long-term diversion of stormwater from the ditches along Slater

3   Avenue" to the Property via an 18-inch culvert, and the added stormwater runoff resulting from

4   the construction of Interstate 405 (I-405).  Dkt. #1–2 at 304.  The Soundview report also posits

5   that the wetland was not formed until after 2006.  *Id.*  Thus, Plaintiffs claimed in their request

6   that the northern half of the Property falls under the exception to the City's definition of wetlands

7   and should not be regulated.  Dkt. #1–3.

8           In October 2019, Weinstein, the City's Planning and Building Director, denied Plaintiffs'

9   request to redesignate the wetland area on the Property, citing prior environmental reports and a

10  recommendation letter from the Washington State Department of Ecology.  Dkt. #1–5.

11          Plaintiffs filed a land use petition to King County Superior Court under RCW 36.70C.

12  Dkt. #1–6 at 470.  The court decided that for the second exception to the wetland definition

13  ("wetlands created after July 1, 1990 . . . as a result of the construction of a road, street, or

14  highway"), Weinstein had improperly used the years Slater Avenue and I-405 were constructed

15  to reach his decision.  The court stated, "[T]he critical issue in this case is whether the wetland

16  on Petitioner's property was first created after July 1, 1990," *id.* at 472, and remanded Plaintiffs'

17  petition to the City "for further consideration" of the second exception based on the existing

18  evidence.  *Id.* at 473.

19          In September 2020, on remand, Weinstein again denied Plaintiffs' request for

20  redesignation of the wetland on the Property, concluding that "the wetland was in existence as of

21  July 1, 1990."  Dkt. #26–6.  Plaintiffs filed another land use petition to King County Superior

22  Court.  Dkt. #22–5.  In August 2021, the court denied the petition, stating that Weinstein's "land

23

24

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 4

use decision is supported by substantial evidence" and is neither "clearly erroneous" nor "based on unlawful procedure."[5]  Dkt. #22–4.

Plaintiffs now bring a cause of action under 42 U.S.C. § 1983 against the City, Barnes, and Weinstein, arguing that Defendants acted "under color of state law" to take private property without just compensation in violation of the Fifth Amendment of the United States Constitution. Dkt. #1 at 1.  Plaintiffs contend that a taking occurred when Defendants created and improperly designated an artificial wetland on the Property, thereby depriving them of all economic use of the northern portion.  Dkt. #26 at 22.  Plaintiffs also claim that Barnes and Weinstein intentionally denied short plat approval and final occupancy permits[6] on the southern developments so that they would not contest the NGPE, thereby coercing Plaintiffs into "an uncompensated easement as a condition of developing property."  *Id.* at 20; Dkt. #1 at ¶ 28, 39. Defendants move for summary judgment on Plaintiffs' takings claims and request that Barnes and Weinstein be dismissed under qualified immunity.  Dkt. #21 at 3–4.

### III.

### ANALYSIS

A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) states, "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" if it could affect the outcome of a case.  *Anderson v. Liberty Lobby,*

---

[5] Plaintiffs initially appealed the superior court's decision, but voluntarily dismissed the appeal in January 2022.  Dkt. #22–6.

[6] There were some instances of delayed permit approval that Plaintiffs point to as evidence of coercion into an easement.  But the City cites Plaintiffs' noncompliance with the terms of the wetland mitigation plan, rather than the NGPE, as the reason for delay.  Dkt. #22–3 at 433, 459.

*Inc.*, 477 U.S. at 242, 248 (1986).  A factual dispute is "genuine" if a reasonable jury could disagree about whether the facts claimed by the moving party are true.  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983).  If the moving party shows that there is no genuine issue of material fact, then the non-moving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  The moving party is entitled to a judgment as a matter of law when "the nonmoving party has failed to make a sufficient showing on an essential element of [their] case."  *Celotex*, 477 U.S. at 323.  Courts must "view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

Plaintiffs advance, in part, a regulatory takings theory.  In a regulatory takings action, "motions for summary judgment must be viewed with particular skepticism.  The importance of the specific facts and circumstances relating to the property and . . . the governmental action militate against summary resolution in most cases."  *Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1508 (9th Cir. 1990).  But this guidance does not preclude courts from granting summary judgment in all regulatory takings contexts.  *See, e.g.*, *Tan Phu Cuong Inv. LLC v. King Cnty.*, 831 F. App'x 235, 237 (9th Cir. 2020) (affirming summary judgment dismissing a takings claim when wetland regulations prevented development on flooded property); *see also Martin v. Town of Simsbury*, 505 F. Supp. 3d 116 (D. Conn. 2020) (granting summary judgment dismissing a takings claim when preexisting frontage requirements and wetland regulations prevented development on plaintiff's property).

B.  Takings

The Fifth Amendment states that the government cannot take private property for public use without "just compensation."  U.S. Const., amend. V.  This prohibition extends to the States

through the Fourteenth Amendment.  U.S. Const., amend. XIV; 42 U.S.C. § 1983; *see Knick v. Twp. of Scott, Penn.*, 139 S. Ct. 2162, 2179 (2019) ("A property owner may bring a takings claim under § 1983 upon the taking of [their] property without just compensation by a local government.").  The Supreme Court has identified four theories of compensable takings: (1) physical takings; (2) per se regulatory takings that deprive owners of all economic use of their property; (3) general regulatory takings; and (4) land-use exactions.  *Lingle v. Chevron U.S.A, Inc.*, 544 U.S. 528, 538 (2005).

    1.   Physical Takings

    When the government requires "an owner to suffer a permanent physical invasion of [their] property," regardless of the size of the invasion, a physical taking occurs.  *Lingle*, 544 U.S. 528, 538 (2005); *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 421–22 (1982) (installation of a 1.5 cubic foot cable box on a private building was a physical taking).  Physical takings are subject to a per se, categorical rule: no public use will justify a physical taking without compensation.  *Loretto*, 458 U.S. at 426.

    Plaintiffs claim that there was a "per se, physical taking" when the City used the "property as a floodplain for discharge of the City's stormwater, changing its character from developable land into a wetland that cannot be used."  Dkt. #26 at 19.

    Flooding of private land by the government can constitute a physical taking.  *Pumpelly v. Green Bay Co.*, 80 U.S. 166, 181 (1871); *Arkansas Game and Fish Comm'n v. United States*, 568 U.S. 23, 27 (2005).  "[W]here real estate is actually invaded by superinduced additions of water . . . so as to effectually destroy or impair its usefulness, it is a taking."  *Pumpelly*, 80 U.S. at 181.  But an owner who purchases property after a permanent flooding does not have a claim for compensation under the Fifth Amendment.  *Palazzolo v. Rhode Island*, 533 U.S. 606, 628 (2001) ("when a State has physically invaded the property . . . any award goes to the owner at the

time of the taking, and [] the right to compensation is not passed to a subsequent purchaser."). The Ninth Circuit recently applied this principle in *Tan Phu Cuong*, stating, "The plaintiffs did not suffer a physical taking because the pooling and drainage issues predated their purchase of the properties."  831 F. App'x at 237.

Plaintiffs cite *Yamagiwa v. City of Half Moon Bay* to show that governmental creation of wetlands can constitute a taking, but the plaintiff in *Yamagiwa* owned the property before the artificial wetlands existed, so the conclusion in that case does not apply to Plaintiffs' physical takings claim.  Dkt. #26 at 19; 523 F. Supp. 2d 1036, 1060 (N.D. Cal. 2007).

The parties debate when the wetland on the Property formed, but they agree that it existed before Plaintiffs purchased the Property in 2016.  Dkt. #26 at 21.  There is thus no dispute that Plaintiffs are subsequent purchasers in the context of a physical takings claim.  Even if the wetland on the Property were artificially created by stormwater runoff from the City, Plaintiffs do not have a right to compensation for a physical taking under the Fifth Amendment.

2.   Regulatory Takings

Regulatory takings are subject to a per se rule only when a regulation deprives a property owner of "all economically beneficial or productive use of land."  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015 (1992).  Courts distinguish per se regulatory takings from general regulatory takings that do not strip all economic value from a property.  *Lingle*, 544 U.S. at 538.  General regulatory takings are assessed under "a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Murr v. Wisconsin*, 137 S. Ct. 1933, 1937 (2017) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)) (internal quotation marks omitted).

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 8

1

        a.   Per Se Regulatory Takings

2        Plaintiffs argue there was a per se, physical taking rather than a regulatory one.  But they

3   also claim that the wetland regulations, as applied to the Property, deprived them of all economic

4   use of the Property's wetland.  Dkt. #1 at ¶ 38; Dkt. #26 at 22.  This claim is better categorized

5   as a per se regulatory takings claim, and the Court thus analyzes it as such.

6        Courts find per se regulatory takings only in "extraordinary case[s]" where "a regulation

7   deprives an owner of '*all* economically beneficial uses' of [their] land."  *Tahoe-Sierra*, 535 U.S.

8   at 303, 330 (quoting *Lucas*, 505 U.S. at 1019).  The loss of value to the property must be so

9   complete as to leave the property "economically idle."  *Lucas*, 505 U.S. at 1019.[7]  Usually this

10  entails "requiring land to be left substantially in its natural state."  *Id*. at 1018.  The regulatory

11  per se standard was established in *Lucas*, in which a beach conservation statute barred the

12  plaintiff from developing his two beachfront properties.  *Id.* at 1031.

13       A court may not conduct a *Lucas* inquiry unless it first finds that the challenged impact of

14  a regulation deprives owners of a property interest that is not already restricted by "background

15  principles of the State's law of property and nuisance."  *Id.* at 1029; *see Palazzolo* 533 U.S. at

16  630 (holding not all enacted state regulations are automatically background principles of state

17

18  ---------------

         [7] The analysis of complete economic loss differs based on whether this Court considers Plaintiffs'
19  property as one property versus two separate parcels, north and south.  *Murr v. Wisconsin* provides three
    factors for assessing what constitutes a whole parcel in a *Lucas* analysis: (1) "the treatment of the land
20  under state and local law"; (2) "the physical characteristics of the land"; and (3) "the prospective value of
    the regulated land."  137 S. Ct. 1933, 1945 (2017).  Plaintiffs do not address the *Murr* test, perhaps
    because evidence in the record suggests only that the contiguous portions should be considered one
21  parcel.  The City has treated the property as one parcel for multiple land sales over several decades, and
    Plaintiffs bought it as such.  Dkt. #26–4 at ¶ 4; Dkt. #1–1 at 226.  As land developers, Plaintiffs should
22  have known—and did know—about the wetland designation and regulations on the northern portion
    before purchasing the property.  *Id*.  It is well established that wetlands are subject to environmental
    regulations under state and local law, so Plaintiffs reasonably should have expected to contend with
23  development regulations on the northern wetland part of the property in the development plans.  And
    neither party has presented evidence about whether the regulated northern wetland area adds value to the
24  southern development.

law).  Defendants (the parties who have allegedly effected the taking) bear the burden of establishing that wetland development restrictions are a background principle of state property law.  *Bridge Aina L'ea, LLC v. State of Hawaii Land Use Comm'n*, CIVIL NO. 11-00414 SOM-BMK, 2016 WL 797567 (D. Haw. Feb. 29, 2016) (citing *Lucas*, 505 U.S. at 1031).

Defendants claim that Plaintiffs have no per se regulatory takings claim because they never had a valid state property interest in the northern portion of the Property: the wetland was regulated when Plaintiffs purchased the Property, so they never had the right to develop on it. Dkt. #21 at 14.  But Defendants cite no legal authorities that establish wetland development restrictions as a background principle of Washington law under this theory, instead making conclusory statements based on facts that show previous restrictions on development for the northern part of the Property.  *Id.* at 14–15.  Thus, Defendants do not meet their burden under this theory, and a *Lucas* inquiry is appropriate.  *Bridge Aina L'ea, LLC v. State of Hawaii Land Use Comm'n*, CIVIL NO. 11-00414 SOM-BMK, 2016 WL 797567 (D. Haw. Feb. 29, 2016).

Defendants argue that they did not deprive the Property of all economic value because Plaintiffs were still able to build and sell several developments on the southern portion of the property.  Dkt. #21 at 16.  Because those plots were developed and sold, Plaintiffs fail to establish a dispute of material fact as to whether the wetland regulations stripped the Property of all economic value.  *See Palazzolo*, 533 U.S. at 631.  Thus, as a matter of law, Plaintiffs fail to establish a per se, regulatory takings claim.

    b.  *Penn Central* Regulatory Takings

There is no simple test for general regulatory takings claims, so judicial decisions are "characterized by essentially ad hoc, factual inquiries . . . designed to allow for careful examination and weighing of all the relevant circumstances."  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322 (2002) (internal quotation marks omitted).  The

goal is to assess whether a "regulation goes too far" as to become a taking.  *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  For *Penn Central* summary judgment inquiries, courts weigh "(1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Murr*, 137 S. Ct. at 1937 (citing *Penn Central*, 438 U.S. at 124); *see, e.g.*, *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1191 (9th Cir. 2012).  In a *Penn Central* inquiry, "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests" are the most important factors.  *Lingle*, 544 U.S. at 540.  Although general regulatory takings claims typically involve fact-specific inquiries, courts have granted summary judgment when the *Penn Central* factors weighed sufficiently against a taking such that no reasonable jury could find one occurred.  *See, e.g.*, *Tan Phu Cuong Inv. LLC v. King Cnty.*, 831 F. App'x 235, 237 (9th Cir. 2020); *Laurel Park Cmty., LLC v. City of Tumwater*, 698 F.3d 1180, 1191 (9th Cir. 2012); *Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1351 (Fed. Cir. 2020); s*ee also Mehaffy v. United States*, 499 Fed. App'x 18, 1 (Fed. Cir. 2012); *Good v. United States*, 189 F.3d 1355, 1363 (Fed. Cir. 1999).

Defendants address each of the *Penn Central* factors in their motion for summary judgment, claiming that (1) Plaintiffs did not lose enough economic value; (2) Plaintiffs did not have reasonable and distinct investment-backed expectations of developing the northern wetland area at the time of purchase; and (3) the environmental character of wetlands regulation weighs in favor of summary judgment.  Dkt. #21 at 17–19.  Plaintiffs do not address the *Penn Central* test except to argue that (1) the case should be analyzed as a physical taking or land-use exaction rather than a regulatory taking, and (2) summary judgment for *Penn Central* takings is inappropriate because it is "inherently factually intensive."  Dkt. #26 at 26 ("[i]f a court finds that a . . . 'categorical' taking has occurred, the takings inquiry ends, and no analysis under *Penn*

*Central* is performed.") (quoting *Lemon Bay Cove, LLC v. United States*, 147 Fed. Cl. 528, 534 (2020)).  As discussed below, the *Penn Central* factors here weigh sufficiently against Plaintiffs such that summary judgment is appropriate.

> (1) Economic Impact

Defendants argue that Plaintiffs "cannot demonstrate a diminution in value sufficient to rise to the level of a taking, especially given that . . . Plaintiffs developed and built homes on the Property for sale." Dkt. #21 at 17.  Defendants contend that courts have found regulatory takings when plaintiffs lost a presumably higher percentage of total property value than the Plaintiffs did here.  *Id.*  In *Tan Phu Cuong*, the Ninth Circuit affirmed summary judgment dismissing a regulatory takings claim, referring to the *Penn Central* test and stating, "plaintiffs do not discuss these factors and, in any case, have failed to identify any economic injury attributable to the County's regulation of their properties."  831 F. App'x at 238.  Plaintiffs do not address the *Penn Central* factors and identify no specific economic injury to the Property from the City's wetland regulations beyond a general prohibition on development.  Thus, this factor weighs for summary judgment.  *See Celotex*, 477 U.S. at 323.

> (2) Investment-Backed Expectations

Investment-backed expectations must be "objectively reasonable."  *See Colony Cove*, 888 F.3d at 452.  Though courts have been careful to avoid a per se rule that lack of investment backed expectations disposes of a *Penn Central* takings analysis, in several cases courts have dismissed such claims because, on a specific set of facts, the complete absence of reasonable investment backed expectations weighed sufficiently to be decisive.  *See Anaheim Gardens, L.P. v. United States*, 953 F.3d 1344, 1351 (Fed. Cir. 2020) (affirming summary judgment dismissing a takings claim because when "a sophisticated investor voluntarily purchased its property with knowledge" of a regulation that causes economic loss, "the complete lack of investment-backed

expectations overwhelmingly outweighs the other *Penn Central* factors."); *see also Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005 (1984) ("the force of the [reasonable expectations factor] is so overwhelming . . . that it disposes of the taking question."); *Mehaffy v. United States*, 499 Fed. App'x 18, 1 (Fed. Cir. 2012) (affirming summary judgment against a takings claim because plaintiff's lack of investment-backed expectations for filling regulated wetland property was dispositive); *Good v. United States*, 189 F.3d 1355, 1363 (Fed. Cir. 1999) (affirming summary judgment for the Government and declining to weigh other *Penn Central* factors because plaintiff, as a matter of law, lacked reasonable investment-backed expectations for building on highly regulated wetlands).

The parties do not dispute that Plaintiffs were aware of the wetland regulations on the Property at the time of purchase in 2016. Dkt. #26–4 at ¶ 4. Though Plaintiffs later called the Property's wetland designation into question, the Court looks to the regulatory environment at the time of acquisition to assess a takings claims. *Bridge Aina Le'a*, 950 F.3d at 634. Plaintiffs do not raise a genuine issue of material fact about their knowledge of whether the northern portion of the Property was a regulated wetland unsuitable for development at the time of purchase. Thus, the Court concludes that, as a matter of law, Plaintiffs could not have had distinct investment-backed expectations for the Property's northern wetland area, and this factor overwhelmingly weighs for summary judgment.

(3) Character of Government Action

A taking "may be more readily found when the interference with property can be characterized as a physical invasion by the government, than when interference arises from some public program adjusting the benefits and burdens of economic life to promote the common good." *Penn Central*, 438 U.S. at 124. Generally, the government cannot "forc[e] some people alone to bear public burdens, which, in all fairness and justice, should be borne by the public as a

1    whole." *Lingle*, 544 U.S. at 537.  Additionally, a takings claim must be considered in "'light of

2    the context and . . . history' of the land use decisions related to [the] property." *Buckles v. King*

3    *Cty.*, 191 F.3d 1127, 1139 (9th Cir. 1999) (quoting *City of Monterey v. Del Monte Dunes at*

4    *Monterey, Ltd.*, 526 U.S. 687, 706 (1999)).

5         Wetland regulations are widespread in Washington, and they affect all owners of land

6    that contains wetlands, which would generally support Defendants' claim that Plaintiffs were not

7    unfairly singled out.  But Plaintiffs have contested the context and history around the specific

8    application of the City's local wetland regulations to the Property.  Dkt. 26 at 17.  Thus,

9    Plaintiffs have shown disputed facts may exist as to the character of Defendants' actions towards

10   the Property's wetland area.  This factor weighs slightly against summary judgment.

11        But because Plaintiffs have presented no evidence of (1) lost economic value in the

12   Property because of wetland regulations and (2) reasonable investment-backed interests in

13   development on the northern wetland portion of the Property—the two most important factors of

14   the *Penn Central* test—the Court concludes that summary judgment is appropriate.

15        3.   Land-Use Exactions

16        Courts also find takings when land use permits are conditioned on unconstitutional

17   takings of private property, known as "land-use exactions."  *Nollan v. California Coastal*

18   *Comm'n*, 483 U.S. 825, 841–42 (1987); *Dolan v. City of Tigard*, 512 U.S. 374, 394–96 (1994).

19   These cases, often involving governmental land use easements, require the court to parse

20   reasonable permit conditions from those that amount to "an out-and-out plan of extortion."

21   *Nollan*, 483 U.S. at 837 (quoting *J.E.D. Assocs., Inc. v. Atkinson*, 121 N.H. 581, 584 (1981)).

22   Land-use exactions are a specific category of taking that "involve a special application of the

23   'doctrine of unconstitutional conditions,'" which asserts that the government may not require

24   property owners to choose between ceding property without compensation or providing the

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 14

government "a discretionary benefit that has little or no relationship to the property." *Lingle*, 544 U.S. at 547 (quoting *Dolan*, 512 U.S. at 385).

Defendants claim that Plaintiffs voluntarily negotiated the Agreement, including the NGPE, so they cannot bring a land-use exaction claim. Dkt. #27 at 9–10; *see also Leroy Land Dev. v. Tahoe Reg. Plan. Agency*, 939 F.2d 696 (9th Cir. 1991) (finding that a land use exaction had not occurred where a settlement condition restricting land use was "entered into voluntarily, in good faith and is supported by consideration."). Plaintiffs assert that the contract was involuntary because they were coerced into the NGPE in return for approval on the short plat and occupancy permits. Dkt. #26 at 17, 20, 25. Plaintiffs negotiated the terms of the Agreement, which allowed for potential revision of the NGPE, but the NPGE itself was a requirement in the original short plat approval and was not subject to negotiation. Dkt. #22-3 at 78. Here, unlike in *Leroy*, the parties did not reach a settlement on their legal claims because they disagreed about the validity of the NGPE. Dkt. #26 at 11. Thus, this case appears more akin to traditional land-use exaction cases. *See, e.g.*, *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 599 (2017) (district's proffered choice to plaintiff between ceding more wetland property for a conservation easement or restoring distant, unrelated public wetlands was still coercive and subject to a land-use exaction takings inquiry).

An impermissible land-use exaction occurs when the government enforces a land use permit condition that has no "essential nexus" to the state interest motivating the condition. *Nollan*, 483 U.S. at 837 (holding no sufficient nexus existed between a public pedestrian easement across the property's beachfront area and the state interest of preserving the public's "psychological" and visual access to the beach after construction of a multi-story home). If a prohibition would already be "a legitimate exercise of the police power rather than a taking," then it is appropriate to provide an uncompensated "alternative to that prohibition which

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 15

accomplishes the same purpose." *Id.* at 836–37.  But the substituted condition must "further the end advanced as the justification for the prohibition," or the situation "becomes, quite simply, the obtaining of an easement to serve some valid governmental purpose, but without payment of compensation." *Id.* at 837; *see also Koontz*, 570 U.S. at 611 (2017).  Also, the government must "make some sort of individualized determination" that there is "rough proportionality" both "in nature and extent" between the required land use dedication and the impact of the proposed development.  *Dolan*, 512 U.S. at 391 (holding that a city did not make an adequate determination of proportionality between the impact of new development on plaintiff's property and the need for a public pedestrian path on the property).

Here, there is an essential nexus between the state interest of wetland conservation—a field of regulation that the Washington legislature assigns to the City—and an easement that protects the wetland area on the Property from development or harm.  There is also an adequate relationship between the potential environmental impact of Plaintiffs' developments on the Property's northern wetland areas and a conservation easement for those areas.  The City made an individualized determination of the nature and extent of that relationship, as shown by the dozens of pages of environmental studies and wetland mitigation plan in Plaintiffs' short plat application approval.  Dkt. #22–3 at 77–203.  Thus, this case can be distinguished from land-use exaction cases when courts found a taking.  *See Nollan*, 483 U.S. at 837; *Dolan*, 512 U.S. at 391; *Koontz*, 570 U.S. at 599.  The terms of the NGPE, the short plat approval requiring the NGPE, and the communications between Plaintiffs and Defendants about the NGPE are all on the record and undisputed.  There is no genuine dispute of material fact as to the land-use exaction conditions, so summary judgment against this claim is warranted.

C.  Qualified Immunity

Defendants argue that Barnes and Weinstein should be dismissed from this case under the doctrine of qualified immunity.  Dkt. #21 at 21.  Qualified immunity protects government officials from liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  Because the Court concludes that no constitutional right has been violated, it does not reach the question of qualified immunity.

D.  Assorted Other Claims

In the complaint, Plaintiffs list three additional causes of action—equal protection, due process, and privileges and immunities—but do not explain them or mention them again in any briefing.  Dkt. #1 at ¶ 42.  Defendants address each cause in their motion for summary judgment, asking for dismissal on all three.  Dkt. #21 at 23–25.  Plaintiffs have not adequately developed these claims and it is unclear whether they intend to proceed with them or abandon them. Because there is no argument or evidence in the record to support these claims, the Court concludes that dismissal is appropriate.  *Celotex*, 477 U.S. at 323.

E.  Rule 56(d)

Citing Federal Rule of Civil Procedure 56(d), Plaintiffs argue that Defendants' motion is premature.  Dkt. #26 at 13.  The rule allows this Court to dismiss or continue a summary judgment motion if the "nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."  Plaintiffs request additional discovery about several topics—all relating to Barnes and Weinstein's determination that the property is a regulated wetland or the City's policies, procedures, and training around wetland regulation. Dkt. #21 at 14–17.

To prevail on a Rule 56(d) additional discovery request, a party must show that "allowing additional discovery would preclude summary judgment." *Martinez v. Columbia Sportswear USA Corp.*, 553 F. App'x 760, 761 (9th Cir. 2014).  Plaintiffs do not show how facts about the determination of the Property's wetland status or the City's procedures for easement exactions would preclude summary judgment.  Plaintiffs' discovery requests rely on the argument that Weinstein mischaracterized the Property as a wetland, but this issue has already been litigated through land use petitions in state court.  In Fifth Amendment takings claims, what matters is the compensable effect of a regulation on a property, so an inquiry into whether Defendants were correct in designating the northern Property as a wetland plays no role in this takings analysis. *See Lingle*, 544 U.S. at 540.  To the extent that Plaintiffs seek discovery regarding qualified immunity for Barnes and Weinstein, the request is moot because of the conclusion above.  The Court therefore declines to dismiss or defer judgment on Defendants' motion.

## IV.

### CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment.  Dkt. # 21.

Dated this 15th day of November, 2022.

John H. Chun
United States District Judge

ORDER GRANTING DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT - 18